(A–8)

CITY OF CAMDEN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

_____

(A–5)

WILLIAM H. IMKEN, INDIVIDUALLY AND AS MAYOR OF THE BOROUGH OF HASBROUCK HEIGHTS AND THE BOROUGH OF HASBROUCK HEIGHTS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. RICHARD C. LEONE, INDIVIDUALLY AND AS STATE TREASURER OF THE STATE OF NEW JERSEY, SIDNEY GLASER, INDIVIDUALLY AND AS DIRECTOR OF THE DIVISION OF TAXATION OF THE STATE OF NEW JERSEY, EDWARD HOFGESANG, INDIVIDUALLY AND AS COMPTROLLER OF THE STATE OF NEW JERSEY, WILLIAM F. HYLAND, INDIVIDUALLY AND AS ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, PATRICIA Q. SHEEHAN, INDIVIDUALLY AND AS COMMISSIONER OF COMMUNITY AFFAIRS OF THE STATE OF NEW JERSEY, JOHN F. LAEZZA, JR., INDIVIDUALLY AND AS DIRECTOR OF THE DIVISION OF LOCAL FINANCE OF THE DEPARTMENT OF COMMUNITY AFFAIRS OF THE STATE OF NEW JERSEY, BRENDAN T. BYRNE, INDIVIDUALLY AND AS GOVERNOR OF THE STATE OF NEW JERSEY, THE NEW JERSEY STATE SENATE AS A BODY POLITIC OF THE STATE OF NEW JERSEY, FRANK J. DODD, INDIVIDUALLY AND AS PRESIDENT OF THE NEW JERSEY STATE SENATE AND AS REPRESENTATIVE OF A CLASS CONSISTING OF THE INDIVIDUAL MEMBERS OF THE NEW JERSEY STATE SENATE, THE NEW JERSEY STATE GENERAL ASSEMBLY AS A BODY POLITIC OF THE STATE OF NEW JERSEY AND S. HOWARD WOODSON, JR., INDIVIDUALLY AND AS SPEAKER OF THE NEW JERSEY STATE GENERAL ASSEMBLY AND AS REPRESENTATIVE OF A CLASS CONSISTING OF THE INDIVIDUAL MEMBERS OF THE NEW JERSEY STATE GENERAL ASSEMBLY, DEFENDANTS-RESPONDENTS.

_____

PAUL T. JORDAN, M. D., INDIVIDUALLY AND AS MAYOR OF THE CITY OF JERSEY CITY, ET AL., PLAINTIFFS, v. RICH-

ARD C. LEONE, INDIVIDUALLY AND AS TREASURER OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS.

MICHAEL V. MAROTTI, INDIVIDUALLY AND AS MAYOR OF THE TOWN OF BELLEVILLE, ET AL., PLAINTIFFS, v. RICHARD C. LEONE, ETC., ET AL., DEFENDANTS,
AND
(A–6)

BOARD OF COMMISSIONERS OF THE TOWN OF NUTLEY, AND THE TOWN OF NUTLEY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. RICHARD C. LEONE, INDIVIDUALLY AND AS STATE TREASURER OF THE STATE OF NEW JERSEY, SIDNEY GLASER, INDIVIDUALLY AND AS DIRECTOR OF THE DIVISION OF TAXATION OF THE STATE OF NEW JERSEY, EDWARD HOFGESANG, INDIVIDUALLY AND AS COMPTROLLER OF THE STATE OF NEW JERSEY, WILLIAM F. HYLAND, INDIVIDUALLY AND AS ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, PATRICIA Q. SHEEHAN, INDIVIDUALLY AND AS COMMISSIONER OF COMMUNITY AFFAIRS OF THE STATE OF NEW JERSEY, JOHN F. LAEZZA, JR., INDIVIDUALLY AND AS DIRECTOR OF THE DIVISION OF LOCAL FINANCE OF THE DEPARTMENT OF COMMUNITY AFFAIRS OF THE STATE OF NEW JERSEY, BRENDAN T. BYRNE, INDIVIDUALLY AND AS GOVERNOR OF THE STATE OF NEW JERSEY, THE NEW JERSEY STATE SENATE AS A BODY POLITIC OF THE STATE OF NEW JERSEY, FRANK J. DODD, INDIVIDUALLY AND AS PRESIDENT OF THE NEW JERSEY STATE SENATE AND AS REPRESENTATIVE OF A CLASS CONSISTING OF THE INDIVIDUAL MEMBERS OF THE NEW JERSEY STATE SENATE, THE NEW JERSEY STATE GENERAL ASSEMBLY AS A BODY POLITIC OF THE STATE OF NEW JERSEY, AND S. HOWARD WOODSON, JR., INDIVIDUALLY AND AS SPEAKER OF THE NEW JERSEY STATE GENERAL ASSEMBLY AND AS REPRESENTATIVE OF A CLASS CONSISTING OF THE INDIVIDUAL MEMBERS OF THE NEW JERSEY STATE GENERAL ASSEMBLY, DEFENDANTS-RESPONDENTS.

CITY OF CAMDEN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, ET AL., PLAINTIFFS, AND TOWNSHIP OF LAKEWOOD, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-INTERVENOR, v. BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, DEFENDANT.

(A–9)

CITY OF CAMDEN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, AND CITY OF NEWARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-INTERVENOR-APPELLANT, v. BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

CITY OF LONG BRANCH, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

(A–7)

EDWARD G. O'BYRNE, JAMES W. ROE, JOSEPH L. BUBBA, JOSEPH F. D'ARCO, CHARLES S. DORMAN, LOUISE FRIEDMAN, SIDNEY H. REISS, INDIVIDUALLY AS TAXPAYERS, AND COLLECTIVELY AS THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF PASSAIC, PLAINTIFFS-APPELLANTS,

AND

(A–80)

COUNTY OF HUDSON, INTERVENOR-APPELLANT, v. BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, EDWARD HOFGESANG, COMPTROLLER OF THE STATE OF NEW JERSEY, RICHARD C. LEONE, TREASURER OF THE STATE OF NEW JERSEY, SIDNEY GLASER, DIRECTOR OF THE DIVISION OF TAXATION OF THE STATE OF NEW JERSEY, NEW JERSEY STATE SENATE AS A BODY POLITIC OF THE STATE OF NEW JERSEY, MATTHEW J. FELDMAN, AS PRESIDENT OF THE NEW JERSEY STATE SENATE AND AS REPRESENTATIVE OF A CLASS CONSISTING OF THE INDIVIDUAL MEMBERS OF THE NEW JERSEY STATE SENATE, NEW JERSEY STATE GENERAL ASSEMBLY AS A BODY POLITIC OF THE STATE OF NEW JERSEY, JOSEPH A. LE FANTE, AS SPEAKER OF THE NEW JERSEY GENERAL ASSEMBLY AND AS REPRESENTATIVE OF A CLASS CONSISTING OF THE INDIVIDUAL MEMBERS OF THE NEW JERSEY STATE GENERAL ASSEMBLY, ALAN SAGNER, COMMISSIONER OF THE DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS,

AND

JEREMIAH F. O'CONNOR, INDIVIDUALLY AND AS DIRECTOR OF THE BOARD OF CHOSEN FREEHOLDERS OF THE

136

COUNTY OF BERGEN, AND THE COUNTY OF BERGEN, A BODY POLITIC AND CORPORATE OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, THE NEW JERSEY LEGISLATURE, ALAN SAGNER, COMMISSIONER OF TRANSPORTATION, RICHARD C. LEONE, STATE TREASURER, SIDNEY GLASER, DIRECTOR, DIVISION OF TAXATION, EDWARD HOFGESANG, DIRECTOR OF BUDGET AND ACCOUNTING, AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

(A–10)

ANDREW M. SMITH, JR., INDIVIDUALLY AND AS SURROGATE OF THE COUNTY OF MONMOUTH, PLAINTIFF-APPELLANT, v. CLIFFORD GOLDMAN, STATE TREASURER, EDWARD HOFGESANG, COMPTROLLER, SIDNEY GLASER, DIRECTOR OF THE DIVISION OF TAXATION, BRENDAN T. BYRNE, GOVERNOR OF THE STATE OF NEW JERSEY, THE LEGISLATURE OF NEW JERSEY, AND THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued September 10, 1979—Decided February 5, 1980.

*Ralph W. Chandless* argued the cause for appellants William H. Imken, etc., et al. (*Chandless, Weller & Kramer*, attorneys).

*Anthony T. Drollas* argued the cause for appellants Board of Commissioners of the Town of Nutley, et al.

*Louis A. Vargas* argued the cause for appellant City of Camden, etc. (*Martin F. McKernan, Jr.,* City Attorney, attorney; *John B. Elbert*, on the brief).

*William J. Schwartz* argued the cause for appellant City of Newark, etc. (*Salvatore Perillo*, Corporation Counsel, attorney; *Melvin Simon*, Assistant Corporation counsel, on the brief).

*Vincent P. Rigolosi* argued the cause for appellants Edward G. O'Byrne, et al. and Jeremiah F. O'Connor, et al. (*Vincent P. Rigolosi*, Bergen County Counsel, and *Martin* Verp, Passaic County Counsel, attorneys; *Isabel Stark*, Assistant Bergen County Counsel, on the brief).

*Harold Krieger*, County Counsel argued the cause for appellant County of Hudson.

*Andrew M. Smith, Jr.*, argued *pro se.*

*Stephen Skillman*, Assistant Attorney General argued the cause for respondents Brendan T. Byrne, et al. (*John J. Degnan*, Attorney General of New Jersey, attorney; *Peter D. Pizzuto*, Deputy Attorney General, on the brief).

*John C. Tarrantino* argued the cause for respondents The New Jersey State Senate, etc., et al.

The opinion of the Court was delivered by

HANDLER, J.

These joint appeals arise from a number of lawsuits raising identical issues. Several municipalities and counties have chal-

lenged the failure of the Governor and Legislature and certain state officials to appropriate and expend state revenues pursuant to particular statutes which purport to provide funds for local government uses. These challenges present major questions concerning the appropriate constitutional framework governing the state budgetary process, the responsibilities of the Legislature and Governor with respect to state expenditures, and the proper role of the courts in resolving conflicting claims between the State and its governmental subdivisions over entitlement to state revenues.

One group of cases consists of separate actions brought by the cities of Camden and Newark, the town of Nutley, and the borough of Hasbrouck Heights, in which these municipalities sought to have certain revenues appropriated for their use in the State's annual budget. Particularly, they contended that under certain provisions of the Sales and Use Tax Act, *N.J.S.A.* 54:32B–30 to 54:32B–36 (since repealed by *L.*1976, *c.* 73, § 11), ten percent (10%) of the revenues that the State derived from these taxes was to be allotted "as State aid to municipalities for general municipal purposes." *N.J.S.A.* 54:32B–31 (repealed). The Governor did not recommend any such apportionment to municipalities in his February 4, 1975, annual budget message for the 1975–1976 fiscal year, although such funding had been recommended in all previous budget messages and included in all State budgets since 1969, the effective date of these particular provisions of the Sales and Use Tax Act. The municipalities asserted that they had anticipated receipt of such funds and had included them in their own proposed budgets which subsequently had been approved by the Director of the Division of Local Finance pursuant to *N.J.S.A.* 40A:4–1 *et seq.* Because of the absence of this appropriation in the State's General Appropriation Act, *L.*1975, *c.* 128, these municipalities alleged the need to increase their local tax rates.

Additionally, two of the municipalities, Nutley and Hasbrouck Heights, complained in their separate suits of lost appropriations from the bus franchise replacement tax, which provides that the State make annual payments to municipalities of certain monies to replace the revenues those municipalities had previously received through collection of the since-repealed bus franchise taxes. *N.J.S.A.* 48:4–14.2.[1] Although the Governor had recommended an appropriation for this purpose in his budget message for fiscal 1975–1976 and such appropriation was included in the General Appropriation Act for that fiscal year as initially passed by the Legislature, it was effectively excluded from the final state appropriation when the Governor exercised a line item veto of this specific appropriation and the Legislature subsequently failed to override this veto.

The municipalities made several demands for relief, including a court order directing the Legislature to make the requested appropriations and the Governor to approve them. The actions were consolidated and tried in the Superior Court, Law Division, Mercer County. On motions by all parties for summary judgment, the trial court ruled in favor of defendants; plaintiffs appealed. The Appellate Division consolidated these cases with separate actions brought by several counties (see below) which were also on appeal before that court. The Appellate Division, in an unreported opinion, subsequently affirmed the trial court's decision. *Camden v. Byrne,* A–2828–75 (App.Div. May 11, 1978).

In a second group of cases, Bergen and Passaic Counties sought payments from the State for general highway purposes pursuant to several statutes.[2] *N.J.S.A.* 52:27B–20 provides that

---

[1]These two municipalities also included in their complaints a claimed appropriation pursuant to *N.J.S.A.* 54:11D–1 *et seq.* This statute authorized an allocation to municipalities based on taxes levied on personal business property. However, although this claim was before the trial court, it was apparently abandoned on appeal.

[2]Hudson County was permitted to intervene as a party–plaintiff before the Appellate Division.

certain monetary sums, labeled "mandatory dedications," are to be included in the Governor's annual budget message to the Legislature to be allotted to each county for highway expenses. *N.J.S.A.* 52:27B–20 B(2)(a), (b) and (c). *N.J.S.A.* 27:14–1 also provides for a stated amount of monies to be apportioned to each county for highway costs.[3] The Governor did not recommend appropriations pursuant to these statutes in his 1975–1976 budget message.

In addition, these counties, as well as Monmouth County in a separate case, also claimed that state appropriations under the Transfer Inheritance Tax Act, *N.J.S.A.* 54:33–1 *et seq.*, had been wrongfully withheld. That statute provides for five percent (5%) of the transfer inheritance taxes collected by the State on "property of resident decedents in the county" to be paid over to the county. *N.J.S.A.* 54:33–10. Although the Governor originally proposed this funding in his budget message and it was included in the initially passed appropriation act, the Governor exercised his line item veto power to exclude it from the final appropriation act.

Bergen and Passaic Counties sought a court order that various State officials pay over the monies they believed should have been apportioned to the counties or, in the alternative, to enjoin the appropriation of such funds for any purpose other than for county use. These suits were consolidated and tried in the Superior Court, Law Division, Bergen County, where summary judgment was subsequently entered for defendants. Following

---

[3]Passaic County also sought funds pursuant to *N.J.S.A.* 27:13A–1, the State Aid Road System Act of 1967, which provided for state aid to counties for road repairs and maintenance, and *N.J.S.A.* 26:2F–2 and 26:2F–4, the State Health Aid Act of 1966, since repealed by *L.*1977, *c.* 322, § 15, effective January 23, 1978, which provided for State aid to counties supplying basic health services. However, Passaic's claim pursuant to *N.J.S.A.* 26:2F–2 and 26:2F–4 was abandoned before trial as those funds were eventually received by the county. The fate of Passaic's claim pursuant to the Road System Act is not indicated in the record.

the entry of judgment, an appeal was taken to the Appellate Division, where, as already mentioned, these actions were consolidated with those of the municipalities. Again, as noted above, the Appellate Division, in an unreported opinion, affirmed the trial courts' decisions in both groups of cases.

The separate suit instituted by Monmouth County was a direct appeal to the Appellate Division. The county complained not only of the failure of the State to appropriate the proceeds of the transfer inheritance tax for fiscal year 1975–1976, but for fiscal 1976–1977 as well. It sought a court order directing the State Treasurer and Comptroller to remit the funds in question to the county. In a separate opinion, the Appellate Division ruled in favor of defendants. *Smith v. Goldman*, 159 *N.J.Super.* 297 (App.Div.1978). Petitions for certification to this Court were granted in all cases. 79 *N.J.* 468–469 (1978); 81 *N.J.* 330 (1979).

I

Article VIII, Section II, paragraph 2 of the New Jersey Constitution (1947) controls on the issues raised by these appeals. This clause mandates that withdrawals of all monies from the State treasury can be accomplished only by legislative appropriation; it further provides for "one general appropriation law covering one and the same fiscal year." Its precise terms in this respect are as follows:

> No money shall be drawn from the State treasury but for appropriations made by law. All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year . . . . [*N.J.Const.* (1947), Art. VIII, § II, par. 2.]

■ It is, of course, obvious that the several statutes involved in this litigation calling for the disbursements of tax revenues, namely, the sales and use tax, *N.J.S.A.* 54:32B–31, the transfer inheritance tax, *N.J.S.A.* 54:33–10, and the bus franchise re-

placement tax, *N.J.S.A.* 48:4–14.2, as well as for the expenditure of state funds for county highways, *N.J.S.A.* 52:27B–20 B(2)(a), (b) and (c) and *N.J.S.A.* 27:14–1, do not constitute legislative appropriations in and of themselves. Additionally, these separate enactments have not been aggregated or included within a single appropriation law encompassing one fiscal year. They cannot serve, therefore, as valid authority for the withdrawal of monies from the State treasury under the State Constitution.

■ There cannot be the slightest doubt that the above-quoted provision of our Constitution firmly interdicts the expenditure of state monies through separate statutes not otherwise related to or integrated with the general appropriation act governing the state budget for a given fiscal year. This particular clause, Article VIII, Section II, paragraph 2, is the center beam of the State's fiscal structure. It cannot in any sense be regarded as merely providing governmental "housekeeping details," necessary and important but not truly vital. See *Vreeland v. Byrne*, 72 *N.J.* 292, 304–305 (1977). Its terms must therefore be given full and complete effect in accordance with their clear and obvious intent.

■ The constitutional requirement of a unitary appropriation law covering but a single fiscal year reflects a fundamental judgment to centralize and simplify state financial operations. This approach was taken in order to improve government operations and to enhance the responsibility and the accountability of public officials. *Report of the Commission on Revision of the New Jersey Constitution* 26–27 (1942); G. Skillman and S. Goldmann, "The Single Budget, Single State Fund and Single Fiscal Year" (Monograph), II *Proceedings of the New Jersey Constitutional Convention of 1947* 1668, 1670, 1680–1683 (hereinafter Skillman and Goldmann, "Single Budget"). See generally New Jersey League of Women Voters, *New Jersey: Spotlight on Government* 94–98 (3d ed. 1978). This constitutional design was intended to eliminate uncoordinated spending on the state

level and to overcome the inefficiency, confusion and abuses which had surrounded the practice of using separate and different budgets, appropriations, and fiscal years within State government. Skillman and Goldmann, "Single Budget," *supra* at 1673–1677. When our modern constitution was adopted, it was observed that "New Jersey's system of dedicated funds had for many years been a target of criticism by those interested in bringing fiscal order into state affairs," *id.* at 1673, and that, even a generation before, this system had been considered " 'the greatest single evil in the administration of the finances of the State,' " *ibid.*, quoting from *Report of the Joint Legislative Survey Commission of New Jersey* 83 (1925). The disbursements called for by several of the statutes involved in this very litigation, particularly those involving "dedicated" highway funds, are prime examples of the piecemeal state financing which the fiscal reforms structured into our present constitution had sought to overcome. Skillman and Goldmann, "Single Budget," *supra* at 1676–1677.

█ No sound reason is here advanced to support the claim that these various statutes are self-executing as current appropriations. No appropriations thereunder were enacted contemporaneously with the general appropriation act for the particular fiscal years. Further, even though certain of these statutes purport to "dedicate" state revenues for a particular purpose, the Legislature has the inherent power to disregard prior fiscal enactments. Statutes similar in nature and purpose to those involved in these appeals have been held to require subsequent legislative appropriations to be effective authorizations of the expenditure of public monies. See, *e. g., Holster v. Bd. of Trustees of Passaic Cty. College,* 59 *N.J.* 60, 62–66 (1971); *City of Passaic v. Consol. Police and Firemen's Pension Fund Comm'n,* 18 *N.J.* 137, 147 (1955); *Amantia v. Cantwell,* 89 *N.J.Super.* 7, 12–15 (App.Div.1965); *Washington Ass'n v. Mid-*

*dleton*, 11 *N.J.Misc.* 277, 279–280, 165 *A.* 423, 424–425 (Sup.Ct. 1933).

The constitutional fulcrum is not shifted by attempts to characterize the several statutes as creating "substantive rights." Any benefits which may accrue to governmental subdivisions under these statutes would affect their residents only indirectly. In any event, calling these statutory directives "substantive rights" in no way diminishes the Legislature's constitutional control over the state fisc. In fact, even with respect to "dedicated" funds, the Legislature in years past has exercised its inherent power to enact specific appropriations of such funds for non-dedicated purposes. Skillman and Goldmann, "Single Budget," *supra* at 1678, referring in part to S. Goldmann and T. Graves, *The Organization and Administration of the New Jersey State Highway Department* 182–186 (1942). In *Amantia v. Cantwell, supra*, it was recognized that the judiciary is unable to compel a requested appropriation even where a statutorily-defined substantive right to the monies is established, observing that although the particular statute clearly gave petitioners a substantive right to the monies they were seeking, the court could not compel payment since "the Legislature ha[d] declined to appropriate funds" for such a purpose. 89 *N.J.Super.* at 15. So also, in the earlier case of *Washington Ass'n v. Middleton, supra*, the court acknowledged that, absent a specific appropriation, monies could not move from the State treasury even to fund statutorily–created substantive rights. 11 *N.J.Misc.* at 279–280, 165 *A.* at 424–425.

■ New Jersey courts have consistently adhered to the principle that the power and authority to appropriate funds lie solely and exclusively with the legislative branch of government. *East Orange v. Palmer*, 52 *N.J.* 329, 337 (1968); *Fitzgerald v. Palmer*, 47 *N.J.* 106, 108 (1966); *Gallena v. Scott*, 11 *N.J.* 231, 238–239 (1953); *Amantia v. Cantwell, supra*, 89 *N.J.Super.* at 12–13; *Washington Ass'n v. Middleton, supra*, 11 *N.J.Misc.* at 280, 165

*A.* at 424–425; *cf. Robinson v. Cahill,* 67 *N.J.* 333, 354 (1975) (*Robinson III* ) (question of proper allocation of education funds which were *constitutionally* mandated to be appropriated). There can be no redress in the courts to overcome either the Legislature's action or refusal to take action pursuant to its constitutional power over state appropriations. *Fitzgerald v. Palmer, supra; Gallena v. Scott, supra; Glassboro v. Byrne,* 141 *N.J.Super.* 19, 23 (App.Div.1976), certif. den. 71 *N.J.* 518 (1976). *Cf. Doe v. Mathews,* 420 *F.Supp.* 865, 870–872 (D.N.J.1976) (even if amendment to appropriations act were held to be unconstitutional, no relief would be available through courts in absence of legislative appropriation). This fixed constraint upon judicial authority was sharply perceived by the court in *Amantia v. Cantwell, supra,* and described as follows:

> [I]t is clear to us that petitioners are entitled to the pay they seek, and we so hold. What this court cannot do, however, is direct that the money be paid to the petitioners or compel respondents to request an appropriation. The power to appropriate money rests with the Legislature. While we recognize petitioners' moral and legal right to the differential pay they seek, this court cannot secure it for them by way of a directive. We can and do declare that the money is due them. Whether or not petitioners receive the money to which they are clearly entitled rests exclusively with the Legislature. [89 *N.J.Super.* at 12–13]

Some plaintiffs also maintain that despite the responsibility of the legislative branch to enact appropriations and the inability of the courts to compel such legislative action, the courts stand in a different posture *vis-á-vis* the Governor with respect to his constitutional and statutory responsibilities over State expenditures. The Governor is statutorily authorized to "examine and consider all requests for appropriations" and to "formulate . . . budget recommendations" to be forwarded to the Legislature for its consideration and ultimate approval. *N.J.S.A.* 52:27B–20. Although the power to expend and actually appropriate monies from the State treasury is reserved exclusively to the Legislature, see *N.J.Const.* (1947), Art. VIII, § II, par. 2, the Governor does have a constitutional role. He may

formally object to any item or items included in an appropriation bill by exercising his line–item veto, thereby excising that item or items from the bill. *N.J.Const.* (1947), Art. V, § I, par. 15. This veto may be overridden only by a two-thirds vote of both the Senate and the General Assembly. *Ibid.* The Governor's statutory authority to propose the State budget and his constitutional power to exercise a selective veto over legislative appropriations reflects his significant responsibilities over the State's fiscal affairs and are an important aspect of the centralization of state finances essential to efficient modern government operations. Skillman and Goldmann, "Single Budget," *supra,* at 1683–1684; S. Goldmann, "The Governor's Veto Power" (Monograph), II *Proceedings of the New Jersey Constitutional Convention of 1947* 1419, 1428; A. Wildavsky, *Budgeting: A Comparative Theory of Budgetary Process* 175 (1975). Since these executive responsibilities are so clearly involved in the budget process, and since the ultimate constitutional responsibility for appropriations rests with the Legislature, the judiciary is without authority to compel either the Legislature to make a specific appropriation or the Governor to recommend or approve one. See, *e. g., Fitzgerald v. Palmer, supra,* 47 *N.J.* at 108; *Amantia v. Cantwell, supra,* 89 *N.J.Super.* at 12–13; Mountain, "The Role of Judicial Activism: Neither Sword Nor Purse?," 10 *Seton Hall L.Rev.* 6, 11 (1979). Thus, the several statutes which form the basis of the claims advanced by the respective municipalities and counties do not surmount the powerful constitutional mandate that state funds can be released from the State treasury only through a duly–enacted appropriations law.

II

█ It is also clear that the several statutes relied upon in these cases cannot have the legal effect of appropriation laws because of other important constitutional considerations as well.

Any attempt to give the statutes such effect would be inconsistent with the constitutional provisions requiring appropriations to be incorporated into a single balanced budget in which current expenditures must be met by current revenues. Article VIII, § II, par. 2 provides explicitly that

> [n]o general appropriation law or other law appropriating money for any State purpose shall be enacted if the appropriation contained therein, together with all prior appropriations made for the same fiscal period, shall exceed the total amount of revenue on hand and anticipated which will be available to meet such appropriations during such fiscal period, as certified by the Governor. [*N.J. Const.* (1947), Art. VIII, § II, par. 2.]

This constitutional provision is an effective barrier to any judicial or executive attempts to give independent effect as appropriations to miscellaneous statutes calling for the disbursement of state revenues. Such collateral efforts to increase state expenditures, which presumably have already been calculated and included in a unitary budget that effectively appropriates revenues sufficient to meet all such expenditures for the fiscal year, would tend to tilt the budget toward imbalance. This cannot be done without violating the constitutional command that the State's finances be conducted on the basis of a single fiscal year covered by a single balanced budget.

Furthermore, to treat these various statutes as tantamount to appropriations would violate our constitutional debt limitation clause. This provision, *N.J.Const.* (1947), Art. VIII, § II, par. 3, is phrased in pertinent part as follows:

> The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein[,]  .  .  .  submitted to the people at a general election and

approved by a majority of the legally qualified voters of the State voting thereon. . . .

The significance of constitutional debt limitation provisions as a component of the State's fiscal structure is rooted in a long history. See A. Tilton, "Constitutional Limitations on the Creation of State Debt" (Monograph), II *Proceedings of the New Jersey Constitutional Convention of 1947* 1708–1728; A. J. Heins, *Constitutional Restrictions Against State Debt* (1963); B. U. Ratchford, *American State Debts* (1941).

The constitutional debt limitation clause prohibits "one Legislature from incurring debts which subsequent Legislatures would be obliged to pay, without prior approval by public referendum." *New Jersey Sports & Exposition Auth. v. McCrane*, 61 *N.J.* 1, 13–14 (1972), app. dism. *sub nom. Borough of E. Rutherford v. New Jersey Sports & Exposition Auth.*, 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.*2d 215 (1972). The obligations created by the various statutes under which the several plaintiffs in this action claim entitlement, if directly enforceable as appropriations, would constitute debts incurred by the Legislature contrary to the terms and intent of the constitutional debt limitation clause. Only if they are *not* considered appropriations would these statutory expenditures be valid under the constitutional debt limitation clause. *Cf. Bulman v. McCrane*, 64 *N.J.* 105, 117–118 (1973) (future installments of rent are not "present debt" in the constitutional sense); *Holster v. Bd. of Trustees of Passaic Cty. College, supra*, 59 *N.J.* at 71 ("a projected or anticipated future legislative appropriation is not a present debt or liability"); *Clayton v. Kervick*, 52 *N.J.* 138, 150–155 (1968) (same); *McCutcheon v. State Building Auth.*, 13 *N.J.* 46, 66, 68–71 (1953) (Jacobs, J., dissenting, observing that future rental obligations, since not binding upon future Legislatures and not effective without future appropriations, did not constitute "debts or liabilities" in the constitutional sense). The relief plaintiffs seek here—to give these statutory enactments the

same force as an appropriation act—would convert them into "debts" binding upon future Legislatures. This cannot be accomplished except through the means prescribed by the debt limitation clause of the Constitution. And it is beyond peradventure that the judiciary, aside from any absolute restraint upon its authority to act in the proper domains of the other two branches of government, is without power either to induce or to compel legislative or executive action which would directly affront the Constitution.

### III

Defendants not only contend that the several statutes relied upon by the municipalities and counties are constitutionally unenforceable, they also assert that these statutes are statutorily ineffective in that they have been impliedly repealed by the Legislature. Under this approach, regardless of whether or not the statutes are deemed to be self-executing, it is urged they have been effectively suspended, supplanted, or repealed by the passage of subsequent laws, namely, the annual appropriation acts which intentionally omitted the expenditures which had been called for by the previous laws. These two sets of enactments, the appropriation acts and these statutory expenditures, are irreconcilable in that each makes different use of the same limited monies.

It should be emphasized that in considering the applicability of the general doctrine of implied repealer, we are here concerned with the impact upon existing statutes of special or unique legislation, namely, a general appropriation law. The appropriation law has a life limited to its fiscal year. Hence, at most, its effect upon inconsistent enactments could endure only for as long as itself endures. It is therefore more accurate to discuss such an effect in terms of *implied suspension* rather than implied repeal.

Whether we are dealing with the notion of implied suspension as distinguished from implied repeal, the judicial

approaches would be the same. Although there generally exists a strong presumption against any implied negation of statutory enactments, this presumption may be overcome when there is a clear showing that two legislative measures are patently repugnant or inconsistent. *Brewer v. Porch*, 53 *N.J.* 167, 173–174 (1969); *Department of Labor & Industry v. Cruz*, 45 *N.J.* 372, 380 (1965); *Swede v. City of Clifton*, 22 *N.J.* 303, 317 (1956). Whether or not the judiciary finds an implied repealer will depend in large part on any relevant expressions of legislative intent as well as the peculiar fact situations presented. *New Jersey State Policemen's Benev. Ass'n v. Morristown*, 65 *N.J.* 160, 164–165 (1974); *Loboda v. Clark Tp.*, 40 *N.J.* 424, 435 (1963); *State v. Hotel Bar Foods, Inc.*, 18 *N.J.* 115, 129 (1955); *Henninger v. Bergen Cty. Bd. of Chosen Freeholders*, 3 *N.J.* 68, 71 (1949); see *Posadas v. National City Bank of New York*, 296 *U.S.* 497, 503–505, 56 *S.Ct.* 349, 352–353, 80 *L.Ed.* 351, 355–356 (1936).

In this case, the legislative failure to appropriate funds to effectuate these several statutes was an intentional and advertent act. In several instances, the Governor disregarded past practice and refused to include these items in his budget message; in others, he exercised his line-item veto power to excise these from the appropriation act. The Legislature did not reenact these itemized appropriations by overriding the Governor's vetoes. Hence, the failure to appropriate on the part of the Legislature cannot be ascribed to indifference, coincidence, or accident.

It follows that such a definite legislative intent as reflected in the general appropriation laws necessarily supersedes any previously expressed legislative desires at least for the duration of the particular appropriation act. The earlier statutes cannot coexist with the enacted appropriation and, consequently, must be deemed to be suspended by adoption of the later appropriation acts. *Bruck v. The Credit Corp.*, 3 *N.J.* 401, 408–409 (1950); see *United States v. Dickerson*, 310 *U.S.* 554, 555–556, 60 *S.Ct.* 1034, 1035, 84 *L.Ed.* 1356, 1359 (1940) (statute providing for

reenlistment bonus suspended by subsequent failure to appropriate); *Friends of the Earth v. Armstrong,* 485 *F.*2d 1, 8–9 (10 Cir. 1973), *cert.* den. 414 *U.S.* 1171, 94 *S.Ct.* 933, 39 *L.Ed.*2d 120 (1974); *contra, Flanders v. Morris,* 88 *Wash.*2d 183, 558 *P.*2d 769 (S.Ct.1977) (appropriation bill cannot "abolish" existing law).

We thus conclude that, in addition to the insurmountable constitutional obstacles which prevent appellants from securing funds under the several statutes, the Legislature itself has expressed its intent with sufficient clarity to render it singularly inappropriate for this Court to give any legal effect whatsoever to the earlier statutory enactments.

## IV

Several other issues are also presented. The counties, for example, contend that transfer inheritance taxes, a portion of which they claim pursuant to *N.J.S.A.* 54:33–10, are collected and held by the State in constructive trust in favor of the particular county and, therefore, are not to be considered as state-owned funds which can be released from the treasury only by legislatively-enacted appropriations. This position presumes that these particular taxes are in actuality local imposts generating purely local revenues and that the State in collecting these revenues is acting in some sense as a custodian for local government. That premise is incorrect. The Transfer Inheritance Tax Act imposes a state tax and the revenues generated by that tax are state revenues.

The Transfer Inheritance Tax Act, originally enacted in 1909, *L.*1909, *c.* 228, has been described as a "privilege levy on the right of succession to property transferred by 'decedents,' levied on the *transferee,* 'in certain cases' specified by the legislat[ure]." *In re Estate of Lichtenstein,* 52 *N.J.* 553, 559 (1968) (emphasis in original). See *In re Estate of Lingle,* 72 *N.J.* 87, 94 (1976). The tax is calculated, assessed, and collected by the Transfer Inheritance Tax Bureau of the State Treasury Depart-

ment's Division of Taxation under the direct supervision of the Director of the Division. Actions to compel payment of the tax are brought in the name of the Director of the Division of Taxation, Department of Treasury. *N.J.S.A.* 54:35–15. Tax delinquents under the act are prosecuted in the name of the State by the Attorney General. *N.J.S.A.* 54:35–16. Penalties imposed for noncompliance are paid directly to the State treasury. *N.J.S.A.* 54:35–4, 54:35–18. The proceeds of the tax are "paid to the state tax commissioner [now Director] to be deposited by him[,] when and as collected, with the treasurer of the state *for the use of the state.*" *N.J.S.A.* 54:35–2 (emphasis added). This Court, in *United States v. Kingsley*, 41 *N.J.* 75 (1963), described the "real significance of the tax" as being the fact that "it vests *in the state* immediately upon the death of the testator." *Id.* at 81 (emphasis added). Accord, *In re Estate of Arkell*, 103 *N.J.Super.* 266, 269 (App.Div.1968). See *N.J.A.C.* 18:26–2.2.

The fact that *N.J.S.A.* 54:33–10 allocates a percentage of these annual proceeds to the various counties cannot convert the tax into something other than a state tax or the tax proceeds into monies not belonging to the State. Even "an impost for county and township purposes is a *state tax* ; it can be imposed by no other authority." *Camden & Amboy R. Co. v. Comm'rs of Appeal*, 18 *N.J.L.* 71, 72 (Sup.Ct.1840) (emphasis added); see *Robinson v. Cahill*, 62 *N.J.* 473, 497 (1973), *cert.* den. *sub nom. Dickey v. Robinson*, 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.* 2d 219 (1973) (*Robinson I*); *Jersey City v. Martin*, 126 *N.J.L.* 353, 360–361 (E. & A. 1941).

While the Legislature "may 'confer upon political [sub-]divisions powers to legislate and provide revenue for defraying the expenses of the local governments,'" *Switz v. Kingsley*, 69 *N.J.Super.* 27, 34 (Law Div. 1961), modified 37 *N.J.* 566 (1962), it has not done so with respect to the counties in the case of the Transfer Inheritance Tax Act. That tax has none of

the indicia of a local tax—it is not locally imposed, it is not locally collected, and its use and distribution do not emanate from delegated local authority. 16 E. McQuillin, *The Law of Municipal Corporations* § 44.02 at 6–7 (3d ed. 1979); see *Brunner v. Morrison*, 123 *N.J.Eq.* 224, 227 (E. & A. 1938).

Appellants' reliance on *Jersey City v. Zink*, 133 *N.J.L.* 437 (E. & A. 1945), cert. den. 326 *U.S.* 797, 66 *S.Ct.* 493, 90 *L.Ed.* 485 (1946), both with respect to the revenues generated by the Transfer Inheritance Tax Act as well as those revenues treated in the several other statutes, is misplaced. The taxing statute in that case, *N.J.S.A.* 54:24–1 *et seq.* (Revised Statutes), in its specific application to class II railroad property, in contrast to other classes of railroad property (compare *N.J.S.A.* 54:24–6 (Revised Statutes) with *N.J.S.A.* 54:35–2), was not so distinctively a state revenue measure as the current Transfer Inheritance Tax. Moreover, the opinion did not discuss either the constitutional appropriations clause then in effect, *N.J.Const.* (1844), Art. IV, § VI, par. 2, which read, "No money shall be drawn from the treasury but for appropriations made by law," or the possible effect of that clause upon the municipal claims for interest monies due upon collected taxes. In any event, a significant factor in the majority's opinion in *Zink* appears to be that principles of equity and fairness there dictated a finding in favor of the municipalities. See 133 *N.J.L.* at 450.

■ Here it may be argued sincerely and persuasively that the various municipalities and counties have been aggrieved by the actions of the State, that is, by the failure of the Legislature to provide them with the monies that they seek and upon which they have come to rely. It is well to remember, however, that the government appellants are but the creatures of the State and are necessarily subordinate to their creator. *Becker v. Adams*, 37 *N.J.* 337, 340 (1962); *Good Deal of Ivy Hill, Inc. v. Newark*, 32 *N.J.* 263, 266–267 (1960); *West Caldwell v. Caldwell*,

26 *N.J.* 9, 31 (1958); *Wagner v. Newark,* 24 *N.J.* 467, 474 (1957); *Jersey City v. Martin, supra,* 126 *N.J.L.* at 361; *Collingswood Sewerage Co. v. Collingswood,* 92 *N.J.L.* 509, 511 (E. & A. 1918); *Atlantic Coast Elec. Ry. Co. v. Public Utility Bd.,* 92 *N.J.L.* 168, 173 (E. & A. 1918), app. dism. 254 *U.S.* 660, 41 *S.Ct.* 10, 65 *L.Ed.* 462 (1920); 1 E. McQuillin, *The Law of Municipal Corporations* § 1.21 at 22–23, § 2.03 at 130, § 3.02 at 203–204 (3d ed. 1971); 2 McQuillin, *supra,* § 4.03 at 8, § 10.08 at 755 (3d ed. 1979); see *Smith v. Penta,* 81 *N.J.* 65, 74–76 (1979), app. dism. 444 *U.S.* 986, 100 *S.Ct.* 515, 62 *L.Ed.2d* 416 (1979). They may complain of the financial niggardliness of their parent, but they are in no position to defy its authority. See *Glassboro v. Byrne, supra,* 141 *N.J.Super.* at 24.

In a similar context, dealing with the financial strictures visited upon municipalities under the current Local Government Cap Law, *N.J.S.A.* 40A:4–45.1 *et seq.,* we recognized the financial difficulties presently confronting municipalities, described as a "fiscal trilemma" in *Atlantic City v. Laezza,* 80 *N.J.* 255, 270 (1979). We nevertheless determined that even though local government might find itself "handcuffed" by statutory fiscal limitations, this Court is "powerless to remove these handcuffs." *N. J. State Policemen's Benev. Ass'n, Local 29 v. Irvington,* 80 *N.J.* 271, 299 (1979). We concluded there, as we do here, that "[t]he fiscal constraints to be imposed upon local governments are matters of legislative, not judicial[,] prerogative." *Ibid.*

It is not for the courts to weigh the equities in a case such as this. The Constitution has placed the State's conscience in these matters in the Legislature and it is that branch of government which must weigh the interests of its citizens at all levels of government. *New Jersey Ass'n on Correction v. Lan,* 80 *N.J.* 199, 211 (1979); *White v. North Bergen,* 77 *N.J.* 538, 554–555 (1978); *Vornado, Inc. v. Hyland,* 77 *N.J.* 347, 354–355 (1978), app. dism. sub nom. *Vornado, Inc. v. Degnan,* 439 *U.S.* 1123, 99

*S.Ct.* 1037, 59 *L.Ed.*2d 84 (1979). It ill behooves the judiciary to deprecate or stigmatize the motives of the State in depriving its municipalities and counties of certain monies. It must be presumed that there were good and sufficient reasons underlying the legislative judgment to devote these limited financial resources elsewhere in the public domain.

Other contentions put forth by appellants have no merit and cannot alter the conclusions reached in these cases. The several statutes relied upon by the municipalities and counties as bases for a court-ordered withdrawal of monies from the State treasury for local government uses are constitutionally and statutorily ineffective. The relief desired by appellants cannot be accomplished in the absence of a valid legislative appropriation specifically designed to achieve that end.

Accordingly, the judgments below are affirmed. No costs.

*For affirmance*— Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal*— None.